

**U.S. Department of Justice**

*United States Attorney*
*District of Maryland*
*Southern Division*

*Matthew J. Maddox*
*Assistant United States Attorney*
*Matthew.Maddox2@usdoj.gov*

*Mailing Address:*
*36 S. Charles Street, 4th Floor*
*Baltimore, MD 21201*

*Office Location:*
*36 S. Charles Street, 4th Floor*
*Baltimore, MD 21201*

*DIRECT: 410-209-4940*
*MAIN: 410-209-4800*
*FAX: 410-962-0716*

May 12, 2019

Andrew R. Szekely
Assistant Federal Public Defender
Office of the Federal Public Defender for the District of Maryland
100 S. Charles Street
Tower II, Suite 900
Baltimore, Maryland 21201

    Re:    <u>United States v. John O'Day,</u>
            Case No. ELH-19-034

Dear Counsel:

       This letter, together with the Sealed Supplement, confirms the plea agreement (this "Agreement") that has been offered to your client, John O'Day (hereinafter "Defendant"), by the United States Attorney's Office for the District of Maryland ("this Office"). If the Defendant accepts this offer, please have the Defendant execute it in the spaces provided below. If this offer has not been accepted by **May 21, 2019**, it will be deemed withdrawn. The terms of the Agreement are as follows:

<u>Offense(s) of Conviction</u>

    1.    The Defendant agrees to plead guilty to Count Thirteen and Count Fourteen of the Superseding Indictment, which charge the Defendant with Bank Fraud in violation of 18 U.S.C. § 1344 and Aggravated Identity Theft in violation of 18 U.S.C. § 1028A. The Defendant admits that the Defendant is, in fact, guilty of the offenses and will so advise the Court.

<u>Elements of the Offense(s)</u>

    2.    The elements of the offense(s) to which the Defendant has agreed to plead guilty, and which this Office would prove if the case went to trial, are as follows: That on or about the time alleged in the Superseding Indictment, in the District of Maryland,

*Count Thirteen (Bank Fraud)*

    a.    The Defendant knowingly executed a scheme or artifice to defraud a financial institution, or knowingly executed a scheme to obtain the money, funds, or other property

owned by or under the control of a financial institution by means of material false or fraudulent pretenses, representations or promises;

  b. the Defendant did so with the intent to defraud;

  c. the financial institution was federally insured; and

*Count Fourteen (Aggravated Identity Theft)*

  d. the Defendant knowingly transferred, possessed, or used the means of identification of another person,

  e. without lawful authority,

  f. during and in relation to a felony enumerated in 18 U.S.C. § 1028A(c), to include the violation of 18 U.S.C. § 1344.

## Penalties

3. The maximum penalties provided by statute for the offense(s) to which the Defendant is pleading guilty are as follows:

| Count | Statute | Minimum Prison | Maximum Prison | Supervised Release | Maximum Fine | Special Assessment |
|---|---|---|---|---|---|---|
| Thirteen | 18 U.S.C. § 1344 | N/A | 30 years | 5 years | $1,000,000 | $100 |
| Fourteen | 18 U.S.C. § 1028A | 2 years (consecutive) | 2 years (consecutive) | 1 year | $250,000 | $100 |

  a. Prison: If the Court orders a term of imprisonment, the Bureau of Prisons has sole discretion to designate the institution at which it will be served.

  b. Supervised Release: If the Court orders a term of supervised release, and the Defendant violates the conditions of supervised release, the Court may order the Defendant returned to custody to serve a term of imprisonment as permitted by statute, followed by an additional term of supervised release.

  c. Restitution: The Court may order the Defendant to pay restitution pursuant to 18 U.S.C. §§ 3663, 3663A, and 3664.

  d. Payment: If a fine or restitution is imposed, it shall be payable immediately, unless the Court orders otherwise under 18 U.S.C. § 3572(d). The Defendant may be required to pay interest if the fine is not paid when due.

      e.      Forfeiture: The Court may enter an order of forfeiture of assets directly traceable to the offense, substitute assets, and/or a money judgment equal to the value of the property subject to forfeiture.

      f.      Collection of Debts: If the Court imposes a fine or restitution, this Office's Financial Litigation Unit will be responsible for collecting the debt. If the Court establishes a schedule of payments, the Defendant agrees that: (1) the full amount of the fine or restitution is nonetheless due and owing immediately; (2) the schedule of payments is merely a minimum schedule of payments and not the only method, nor a limitation on the methods, available to the United States to enforce the judgment; and (3) the United States may fully employ all powers to collect on the total amount of the debt as provided by law. Until the debt is paid, the Defendant agrees to disclose all assets in which the Defendant has any interest or over which the Defendant exercises direct or indirect control. Until the money judgment is satisfied, the Defendant authorizes this Office to obtain a credit report in order to evaluate the Defendant's ability to pay, and to request and review the Defendant's federal and state income tax returns. The Defendant agrees to complete and sign a copy of IRS Form 8821 (relating to the voluntary disclosure of federal tax return information) and a financial statement in a form provided by this Office.

### Waiver of Rights

4.      The Defendant understands that by entering into this Agreement, the Defendant surrenders certain rights as outlined below:

      a.      If the Defendant had pled not guilty and persisted in that plea, the Defendant would have had the right to a speedy jury trial with the close assistance of competent counsel. That trial could be conducted by a judge, without a jury, if the Defendant, this Office, and the Court all agreed.

      b.      If the Defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community. Counsel and the Defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily. All twelve jurors would have to agree unanimously before the Defendant could be found guilty of any count. The jury would be instructed that the Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

      c.      If the Defendant went to trial, the Government would have the burden of proving the Defendant guilty beyond a reasonable doubt. The Defendant would have the right to confront and cross-examine the Government's witnesses. The Defendant would not have to present any defense witnesses or evidence whatsoever. If the Defendant wanted to call witnesses in defense, however, the Defendant would have the subpoena power of the Court to compel the witnesses to attend.

      d.      The Defendant would have the right to testify in the Defendant's own defense if the Defendant so chose, and the Defendant would have the right to refuse to testify. If

the Defendant chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from the Defendant's decision not to testify.

    e.  If the Defendant were found guilty after a trial, the Defendant would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed which would require a new trial or dismissal of the charges. By pleading guilty, the Defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

    f.  By pleading guilty, the Defendant will be giving up all of these rights, except the right, under the limited circumstances set forth in the "Waiver of Appeal" paragraph below, to appeal the sentence. By pleading guilty, the Defendant understands that the Defendant may have to answer the Court's questions both about the rights being given up and about the facts of the case. Any statements that the Defendant makes during such a hearing would not be admissible against the Defendant during a trial except in a criminal proceeding for perjury or false statement.

    g.  If the Court accepts the Defendant's plea of guilty, the Defendant will be giving up the right to file and have the Court rule on pretrial motions, and there will be no further trial or proceeding of any kind in the above-referenced criminal case, and the Court will find the Defendant guilty.

    h.  By pleading guilty, the Defendant will also be giving up certain valuable civil rights and may be subject to deportation or other loss of immigration status, including possible denaturalization. The Defendant recognizes that if the Defendant is not a citizen of the United States, or is a naturalized citizen, pleading guilty may have consequences with respect to the Defendant's immigration status. Under federal law, conviction for a broad range of crimes can lead to adverse immigration consequences, including automatic removal from the United States. Removal and other immigration consequences are the subject of a separate proceeding, however, and the Defendant understands that no one, including the Defendant's attorney or the Court, can predict with certainty the effect of a conviction on immigration status. The Defendant is not relying on any promise or belief about the immigration consequences of pleading guilty. The Defendant nevertheless affirms that the Defendant wants to plead guilty regardless of any potential immigration consequences.

<u>Advisory Sentencing Guidelines Apply</u>

5.  The Defendant understands that the Court will determine a sentencing guidelines range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. § 3551-3742 (excepting 18 U.S.C. §§ 3553(b)(1) and 3742(e)) and 28 U.S.C. §§ 991 through 998. The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

Rev. August 2018

### Factual and Advisory Guidelines Stipulation

6. This Office and the Defendant stipulate and agree to the Statement of Facts set forth in Attachment A, which is incorporated by reference herein.

*Count Thirteen (Bank Fraud) and Relevant Conduct*

    a. This Office and the Defendant further agree that the applicable base offense level for Count Thirteen is **7** pursuant to United States Sentencing Guidelines ("U.S.S.G.") §2B1.1(a)(1).

    b. There is an increase of **14 levels**, pursuant to U.S.S.G. §2B1.1(b)(1)(H), because the loss exceeded $550,000 but did not exceed $1,500,000. (Subtotal: 21)

    c. There is a further increase of **4 levels**, pursuant to U.S.S.G. §2B1.1(b)(2)(B), because the offense resulted in substantial financial hardship to five or more victims. (Subtotal: 25)

    d. There is a further increase of **2 levels**, pursuant to U.S.S.G. §2B1.1(b)(17)(A), because the Defendant derived more than $1,000,000 in gross receipts from one or more financial institutions as a result of the offense. (Subtotal: 27)

    e. This Office does not oppose a **2-level** reduction in the Defendant's adjusted offense level pursuant to U.S.S.G. § 3E1.1(a), based upon the Defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for the Defendant's criminal conduct. This Office agrees to make a motion pursuant to U.S.S.G. § 3E1.1(b) for an additional **1-level** decrease in recognition of the Defendant's timely notification of the Defendant's intention to enter a plea of guilty. This Office may oppose any adjustment for acceptance of responsibility under U.S.S.G. § 3E1.1(a) and may decline to make a motion pursuant to U.S.S.G. § 3E1.1(b), if the Defendant: (i) fails to admit each and every item in the factual stipulation; (ii) denies involvement in the offense; (iii) gives conflicting statements about the Defendant's involvement in the offense; (iv) is untruthful with the Court, this Office, or the United States Probation Office; (v) obstructs or attempts to obstruct justice prior to sentencing; (vi) engages in any criminal conduct between the date of this Agreement and the date of sentencing; (vii) attempts to withdraw the plea of guilty; or (viii) violates this Agreement in any way. (Subtotal: ~~27~~ 24 As MJM) [handwritten]

    f. Thus, the parties anticipate a final offense level of **24** for Count Thirteen.

*Count Fourteen (Aggravated Identity Theft)*

    g. Pursuant to U.S.S.G. §2B1.6, the guideline sentence for Count Fourteen is two years, to be imposed to run consecutively to any term of imprisonment imposed for Bank Fraud.

7. There is no agreement as to the Defendant's criminal history and the Defendant understands that the Defendant's criminal history could alter the Defendant's offense level.

Specifically, the Defendant understands that the Defendant's criminal history could alter the final offense level if the Defendant is determined to be a career offender or if the instant offense was a part of a pattern of criminal conduct from which the Defendant derived a substantial portion of the Defendant's income.

8.   Other than as set forth above, no other offense characteristics, sentencing guidelines factors, potential departures or adjustments set forth in the United States Sentencing Guidelines are in dispute or will be raised in calculating the advisory guidelines range, except the Defendant reserves the right to argue that his criminal history category substantially over-represents the seriousness of his criminal history pursuant to U.S.S.G. § 4A1.3(b), and this Office reserves the right to oppose the departure.

## Obligations of the Parties

9.   At the time of sentencing, this Office and the Defendant reserve the right to advocate for a reasonable sentence, period of supervised release, and/or fine considering any appropriate factors under 18 U.S.C. § 3553(a). This Office and the Defendant reserve the right to bring to the Court's attention all information with respect to the Defendant's background, character, and conduct that this Office or the Defendant deem relevant to sentencing, including the conduct that is the subject of any counts of the Superseding Indictment. At the time of sentencing, this Office will move to dismiss any open counts against the Defendant.

## Waiver of Appeal

10.   In exchange for the concessions made by this Office and the Defendant in this Agreement, this Office and the Defendant waive their rights to appeal as follows:

   a.   The Defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291 or any other statute or constitutional provision, to appeal the Defendant's conviction on any ground whatsoever. This includes a waiver of all right to appeal the Defendant's conviction on the ground that the statute(s) to which the Defendant is pleading guilty is unconstitutional, or on the ground that the admitted conduct does not fall within the scope of the statute(s), to the extent that such challenges legally can be waived.

   b.   The Defendant and this Office knowingly and expressly waive all rights conferred by 18 U.S.C. § 3742 to appeal whatever sentence is imposed (including any term of imprisonment, fine, term of supervised release, or order of restitution) for any reason (including the establishment of the advisory sentencing guidelines range, the determination of the Defendant's criminal history, the weighing of the sentencing factors, and any constitutional challenges to the calculation and imposition of any term of imprisonment, fine, order of forfeiture, order of restitution, and term or condition of supervised release), except as follows:

      i.   The Defendant reserves the right to appeal any sentence that exceeds the statutory maximum; and

ii. This Office reserves the right to appeal any sentence below a statutory minimum.

c. The Defendant waives any and all rights under the Freedom of Information Act relating to the investigation and prosecution of the above-captioned matter and agrees not to file any request for documents from this Office or any investigating agency.

## Restitution

11. The Defendant agrees to the entry of a restitution order for the full amount of the victims' losses. The Defendant agrees that, pursuant to 18 U.S.C. §§ 3663, 3663A, 3563(b)(2), and/or 3583(d), the Court may order restitution of the full amount of the actual, total loss caused by the offense conduct set forth in the factual stipulation. The total amount of restitution shall be due immediately and shall be ordered to be paid forthwith. Any payment schedule imposed by the Court establishes only a minimum obligation. Defendant will make a good faith effort to pay any restitution. Regardless of Defendant's compliance, any payment schedule does not limit the United States' ability to collect additional amounts from Defendant through all available collection remedies at any time. The Defendant further agrees that the Defendant will fully disclose to this Office, the probation officer, and to the Court, subject to the penalty of perjury, all information (including but not limited to copies of all relevant bank and financial records) regarding the current location and prior disposition of all funds obtained as a result of the criminal conduct set forth in the factual stipulation. The Defendant further agrees to take all reasonable steps to retrieve or repatriate any such funds and to make them available for restitution. If the Defendant does not fulfill this provision, it will be considered a material breach of this Agreement, and this Office may seek to be relieved of its obligations under this Agreement.

## Forfeiture

12. The Defendant understands that the Court may enter an Order of Forfeiture as part of the Defendant's sentence, and that the Order of Forfeiture may include assets directly traceable to the offense(s), substitute assets, and/or a money judgment equal to the value of the property derived from, or otherwise involved in, the offenses.

13. The Defendant agrees to consent to the entry of orders of forfeiture for the property described herein and waives the requirements of Federal Rules of Criminal Procedure 11(b)(1)(J), 32.2, and 43(a) regarding notice of the forfeiture in the charging instrument, advice regarding forfeiture during the change of plea hearing, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment.

14. The Defendant agrees to assist fully in the forfeiture of the above property. The Defendant agrees to disclose all assets and sources of income, to consent to all requests for access to information related to assets and income, and to take all steps necessary to pass clear title to the forfeited assets to the United States, including executing all documents necessary to transfer such title, assisting in bringing any assets located outside of the United States within the jurisdiction of the United States, and taking whatever steps are necessary to ensure that assets subject to forfeiture are made available for forfeiture.

15.     The Defendant waives all challenges to any forfeiture carried out in accordance with this Agreement on any grounds, including any and all constitutional, legal, equitable, statutory, or administrative grounds brought by any means, including through direct appeal, habeas corpus petition, or civil complaint. The Defendant will not challenge or seek review of any civil or administrative forfeiture of any property subject to forfeiture under this Agreement, and will not assist any third party with any challenge or review or any petition for remission of forfeiture.

### Defendant's Conduct Prior to Sentencing and Breach

16.     Between now and the date of the sentencing, the Defendant will not engage in conduct that constitutes obstruction of justice under U.S.S.G. § 3C1.1; will not violate any federal, state, or local law; will acknowledge guilt to the probation officer and the Court; will be truthful in any statement to the Court, this Office, law enforcement agents, and probation officers; will cooperate in the preparation of the presentence report; and will not move to withdraw from the plea of guilty or from this Agreement.

17.     If the Defendant engages in conduct prior to sentencing that violates the above paragraph of this Agreement, and the Court finds a violation by a preponderance of the evidence, then: (i) this Office will be free from its obligations under this Agreement; (ii) this Office may make sentencing arguments and recommendations different from those set out in this Agreement, even if the Agreement was reached pursuant to Rule 11(c)(1)(C); and (iii) in any criminal or civil proceeding, this Office will be free to use against the Defendant all statements made by the Defendant and any of the information or materials provided by the Defendant, including statements, information, and materials provided pursuant to this Agreement, and statements made during proceedings before the Court pursuant to Rule 11 of the Federal Rules of Criminal Procedure. A determination that this Office is released from its obligations under this Agreement will not permit the Defendant to withdraw the guilty plea. The Defendant acknowledges that the Defendant may not withdraw the Defendant's guilty plea—even if made pursuant to Rule 11(c)(1)(C)—if the Court finds that the Defendant breached the Agreement. In that event, neither the Court nor the Government will be bound by the specific sentence or sentencing range agreed and stipulated to herein pursuant to Rule 11(c)(1)(C).

### Court Not a Party

18.     The Court is not a party to this Agreement. The sentence to be imposed is within the sole discretion of the Court. The Court is not bound by the Sentencing Guidelines stipulation in this Agreement. The Court will determine the facts relevant to sentencing. The Court is not required to accept any recommendation or stipulation of the parties. The Court has the power to impose a sentence up to the maximum penalty allowed by law. If the Court makes sentencing findings different from those stipulated in this Agreement, or if the Court imposes any sentence up to the maximum allowed by statute, the Defendant will remain bound to fulfill all of the obligations under this Agreement. Neither the prosecutor, defense counsel, nor the Court can make a binding prediction, promise, or representation as to what guidelines range or sentence the Defendant will receive. The Defendant agrees that no one has made such a binding prediction or promise.

### Entire Agreement

19.     This letter, together with the Sealed Supplement, constitutes the complete plea agreement in this case. This letter, together with the Sealed Supplement, supersedes any prior understandings, promises, or conditions between this Office and the Defendant. There are no other agreements, promises, undertakings, or understandings between the Defendant and this Office other than those set forth in this letter and the Sealed Supplement. No changes to this Agreement will be effective unless in writing, signed by all parties and approved by the Court.

If the Defendant fully accepts each and every term and condition of this Agreement, please sign and have the Defendant sign the original and return it to me promptly.

Very truly yours,

Robert K. Hur
United States Attorney

_____
Matthew J. Maddox
Assistant United States Attorney

I have read this Agreement, including the Sealed Supplement, and carefully reviewed every part of it with my attorney. I understand it and I voluntarily agree to it. Specifically, I have reviewed the Factual and Advisory Guidelines Stipulation with my attorney and I do not wish to change any part of it. I am completely satisfied with the representation of my attorney.

5/29/19
Date

_____
John O'Day

I am the Defendant's attorney. I have carefully reviewed every part of this Agreement, including the Sealed Supplement with the Defendant. The Defendant advises me that the Defendant understands and accepts its terms. To my knowledge, the Defendant's decision to enter into this Agreement is an informed and voluntary one.

5/29/19
Date

_____
Andrew R. Szekely, Esq.

Rev. August 2018

## ATTACHMENT A

## STIPULATION OF FACTS

*The undersigned parties stipulate and agree that if this case had proceeded to trial, this Office would have proven the following facts beyond a reasonable doubt. The undersigned parties also stipulate and agree that the following facts do not encompass all of the evidence that would have been presented had this matter proceeded to trial.*

John O'Day (the "Defendant"), age 48, was a resident of Chester, Maryland; Stevensville, Maryland; and Sarasota, Florida between 2016 and 2019. The Defendant worked as a loan officer with a mortgage brokerage company located in Maryland between January 2014 and August 2017.

### I. Overview of the Defendant's Conversion Auto Loan Fraud Schemes

Between April 2016 and January 2018, the Defendant knowingly and intentionally executed, and conspired with others to execute, schemes to defraud at least five federally insured financial institutions and at least 20 individuals to obtain money owned by or under the control of the victim financial institutions by means of false and fraudulent pretenses, representations, and promises.

Specifically, the Defendant and his co-conspirators submitted at least 30 fraudulent applications for auto loans to the victim financial institutions falsely listing the Defendant as the seller of various motor vehicles, which were falsely listed as collateral. At least 27 of the fraudulent applications were successful and resulted in the disbursement of loan checks totaling approximately $1,167,192, which the Defendant obtained and deposited into his personal bank accounts in Maryland. The funds were not used to purchase the vehicles listed as collateral in the loan applications. The Defendant also attempted to obtain additional loan checks, totaling at least approximately $246,000, through several unsuccessful fraudulent auto loan applications.

Most of the applicants listed in the auto loan applications were recruited by the Defendant under false promises and pretenses, but several of the applicants had no knowledge that the Defendant and his co-conspirators submitted applications in their names and never authorized the Defendant or his co-conspirators to do so.

### II. Identity Theft

The Defendant and his co-conspirators used personal identifying information belonging to at least five individuals (including their names, dates of birth, and social security numbers) in at least five of the fraudulent auto loan applications. These applications listed the individual victims as loan applicants and/or purchasers of the vehicles falsely listed as collateral. The Defendant did not have the victims' permission to use their personal identifying information in these applications. At least two of the applications were approved and resulted in the disbursement of loan checks totaling $98,000, which the Defendant obtained and deposited into his personal checking account with TD Bank.

For example, on July 11, 2017, the Defendant and his co-conspirator D.W. caused an application for an auto loan to be submitted to Pentagon Federal Credit Union ("PenFed") via the Internet. The application was submitted in the name of V.G., listed V.G.'s date of birth and social security number, and requested a loan of $50,000 to purchase from the Defendant a 2011 Mercedes G554 vehicle, which the Defendant never owned. The application falsely listed the Defendant's address as V.G.'s address and a phone number used by D.W. as V.G.'s phone number.

V.G. had no knowledge of the Defendant or D.W. Neither the Defendant nor D.W. had V.G.'s permission to submit an auto loan application in her name; nor did either of them have any ownership interest in the vehicle listed as collateral in the application.

On July 12, 2017, PenFed issued a loan check in the amount of $50,000 payable to the Defendant and V.G., and the Defendant received the check. On July 13 and July 14, D.W. sent the Defendant several emails with attachments, which included the following:

1. a copy of a driver's license belonging to V.G.;
2. a power-of-attorney form purporting to designate the Defendant (falsely described as V.G.'s "friend") to act as V.G.'s agent with a range of financial powers to include powers to make withdrawals and to receive funds from financial institutions and to "handle payment for purchase of vehicle and payment deposit from PenFed," and bearing a forged signature of V.G. and fake notary public stamp and signature; and
3. two versions of a form titled "Endorsement Authorization and Release" bearing a forged signature of V.G. and a fake notary public stamp, and falsely representing that V.G. intended for the PenFed loan check to be payable to the Defendant alone and to permit the Defendant to negotiate the check at TD Bank.

On July 17, 2017, security images captured the Defendant at a TD Bank branch in Annapolis, Maryland depositing the $50,000 loan check issued by PenFed into his personal checking account. On July 19, 2017, the Defendant made a payment of $2,000 via PayPal to D.W.

The deposits of PenFed were insured by the National Credit Union Share Insurance Fund, and the deposits of TD Bank were insured by the Federal Deposit Insurance Corporation.

### III. Fraudulent Recruitment of Loan Applicants

Between April 2016 and January 2018, the Defendant also recruited at least 18 individuals to permit the Defendant and his co-conspirators to submit auto loan applications in the individuals' names. The Defendant made false promises and representations to these borrowers in order to induce their participation in the fraud scheme. Specifically, the Defendant falsely promised that he would pay off the auto loans within up to 90 days and that the borrowers would not be responsible for loan payments. He told several of the borrowers that the loan checks would be used to purchase the vehicles listed as collateral for low prices at auction, the vehicles would then be re-sold at higher prices, and that the profit would be used to pay off the loans. The Defendant also asked the borrowers to identify other persons to recruit for auto loan applications, promising to pay them for doing so, and some of the borrowers helped recruit additional borrowers into the scheme.

As a result of the applications, several financial institutions issued loan checks ranging in amounts between $20,000 and $50,000, which the Defendant obtained and used for his own benefit and not to purchase the vehicles listed as collateral in the fraudulent loan applications. The Defendant made payments in smaller amounts to most of the borrowers to assist them temporarily in making periodic payments on the loans and to compensate them for their involvement in the scheme. The Defendant structured these payments to the borrowers in an effort to avoid detection of the fraudulent activity. However, the Defendant eventually ceased assisting the borrowers with their payments and failed to pay off the loans as he promised. Most of the borrowers remained liable for the loans and suffered financial hardship as a result. At least some of the fraudulent auto loans were eventually converted to unsecured personal loans with higher interest rates as a result of the applicants' failure to produce proof that they had purchased the vehicles.

For example, the Defendant contacted K.A. in March 2017 to request her help financing used auto purchases by having auto loans taken out in K.A.'s name and promised to compensate K.A. for her involvement. (K.A. had previously been a mortgage client of the Defendant.) K.A. agreed to participate. The Defendant caused auto loan applications to be submitted to Navy Federal Credit Union ("Navy Federal") and PNC Bank in the name of K.A. Each application falsely listed the Defendant as the seller of a used auto in which he had no ownership interest.

On March 10, K.A. contacted the Defendant by text message stating that she was advised not to participate in the auto loan transactions and that she would "contact the banks and cancel the loans." The Defendant then contacted D.W. by text message about K.A.'s intention to cancel the loans. D.W. offered to call K.A. posing as an employee of Navy Federal. The Defendant agreed that this was a "good idea" and then told K.A. that a "supervisor" from Navy Federal would be calling her. D.W. called K.A. and persuaded her not to cancel the loans. The Defendant signed and provided to K.A. a written agreement produced by D.W., which bore a fake public notary stamp. The document promised that K.A.'s auto loans would be paid off within "45 to 60 days" and that K.A. would not be liable for any payments.

As a result of the fraudulent auto loan applications made in K.A.'s name, Navy Federal and PNC Bank each issued a loan check in the amount of $45,000 payable to the Defendant and K.A. The Defendant and K.A. both endorsed each check, and the Defendant deposited the checks into his personal checking account at two separate branches of TD Bank in Maryland on March 13, 2017. The Defendant subsequently gave K.A. four checks, each in the amount of $5,000, to compensate her for the loan applications. On March 15, the Defendant made payments to D.W. via PayPal totaling $3,350.

The Defendant failed to pay off K.A.'s fraudulent auto loans as promised. Between April and June 2017, the Defendant gave K.A. approximately $5,272 to assist her with making payments on the loans but subsequently ceased assisting her with payments. When K.A. contacted the Defendant about his promise to pay off the loans, the Defendant gave her false assurances that the loan would be paid off imminently but eventually stopped responding to her. K.A. withdrew funds from her retirement account to pay down the balances of the loans.

The deposits of Navy Federal were insured by the National Credit Union Share Insurance Fund, and the deposits of PNC Bank were insured by the Federal Deposit Insurance Corporation.

### IV. Money Laundering

Between January and March 2017, the Defendant was in the process of purchasing a home for himself in Stevensville, Maryland. During this time period, the Defendant made requests to his employer, Tenacity Mortgage, to have the company issue him a "wrk [sic] check" for his closing costs in return for him transferring funds to the company.

Prior to the deposit of K.A.'s auto loan checks (totaling $90,000) into the Defendant's TD Bank personal checking account on March 13, 2017, the balance in the account was approximately $7,641. On March 15, the Defendant transferred $33,750 by wire from that account to an operating account Tenacity Mortgage held at Congressional Bank. The following day, Tenacity Mortgage wired $33,750 to an account the Defendant held with NASA Federal Credit Union ("NASA FCU"), in which the balance had been approximately $21. On March 27, 2017, the Defendant purchased a cashier's check in the amount of $30,000 drawn on his NASA FCU account in order to pay closing costs associated with the purchase of his home.

SO STIPULATED:

_____
Matthew J. Maddox
Assistant United States Attorney

_____
John O'Day
Defendant

_____
Andrew R. Szekely, Esq.
Counsel for Defendant